BC

FILED
11/3/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

VW

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

VISION CHASERS LLC, CARLOS MAXWELL, and ANTIONETTE MAXWELL,

Plaintiffs,

v.

THE UPS STORE, INC.,

Defendant.

**Case No. 1:26-cv-13561**

**Hon. Matthew F. Kennelly**

**Magistrate Judge M. David Weisman**

**RANDOM/CAT 2**

**PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs Carlos Maxwell and Antionette Maxwell (together, the "Maxwells"), appearing *pro se*, respectfully move under Federal Rule of Civil Procedure 65 for the immediate entry of a Temporary Restraining Order and, following an expedited hearing, a Preliminary Injunction against Defendant The UPS Store, Inc. ("TUPSS"). The Maxwells are the sole members of Plaintiff Vision Chasers LLC ("Vision Chasers"), the franchisee of record for both Centers at issue.

On Friday, October 30, 2026, on the eve of Halloween weekend and four days before the November 3, 2026, mediation that TUPSS itself demanded, TUPSS wrongfully terminated both of the Maxwells' franchised Centers "effective immediately" and locked them out of the systems they need to process a single transaction. That ambush was the culmination of a calculated scheme the Maxwells refer to as the "Deceptive Mediation Trap." Unless this Court acts now, TUPSS will complete its seizure of two thriving businesses the Maxwells spent more than a decade building, without paying them a single dollar, before any court can decide whether its conduct was lawful.

In support of this Motion, the Maxwells rely on their contemporaneously filed Memorandum of Law ("Mem."), the Verified Complaint ("Compl."), and the exhibits thereto, each of which is incorporated by reference. In further support, the Maxwells state as follows:

## GROUNDS FOR THE MOTION

### A. The Parties and the Centers

1. Vision Chasers is an Illinois limited liability company whose only members are Carlos and Antionette Maxwell, African American entrepreneurs domiciled in Illinois. Through Vision Chasers, the Maxwells own and operate two The UPS Store franchises: Center No. 6591 at 3231 South Halsted Street in Chicago's Bridgeport neighborhood (the "Chicago Center"), which they have operated for more than a decade, and Center No. 7052 in Burbank, Illinois (the "Burbank Center"), which they have operated for eight years (together, the "Centers"). Compl. ¶¶ 1, 15, 18, 23, 160.

2. TUPSS is a Delaware corporation with its principal place of business in San Diego, California. It is the franchisor of The UPS Store network. Compl. ¶¶ 15, 27.

3. The Maxwells are exemplary franchisees. When they opened the Chicago Center in 2015, Bridgeport was a postal desert with a declining commercial district, and they built the store into one of the largest in its market. They work in their stores twelve to fifteen hours a day, never closed during the COVID-19 pandemic, have paid every royalty owed, and spend tens of thousands of dollars each month on UPS shipping. TUPSS's own center visits routinely scored them above 95%, and TUPSS awarded the Chicago Center Gold Star status for its sales performance. Compl. ¶¶ 1–2, 24–26, 57.

## B. The Deceptive Mediation Trap

4. The initial term of the Chicago Center's Franchise Agreement expired on November 16, 2024, and TUPSS extended it week to week. Ex. B (Mutual Termination Agreement ("MTA")), Recital B; Compl. ¶ 30. TUPSS did not issue its notice of nonrenewal until June 5, 2025, more than six months after the term had already expired. *Id.*, Recital C; Compl. ¶¶ 5, 32. Because the Franchise Agreement's two-year non-compete bars the Maxwells from continuing their business, and because TUPSS gave no timely notice, Illinois law required TUPSS to compensate the Maxwells for the lost value of their business. 815 ILCS 705/20; Ex. A (Franchise Agreement), Ex. D § 3(b)(iii); Compl. ¶¶ 5, 28. TUPSS has not paid them a single dollar. Compl. ¶ 5. Rather than honor that obligation, TUPSS set out to take the Maxwells' business for nothing.

5. *Pretextual cure demands.* TUPSS first pressed cure demands tied to a floor plan TUPSS itself designed more than ten years earlier and to point-of-sale capacity TUPSS itself limits, matters the Maxwells had no power to change. It set the cure windows to run through the holiday shipping season and the January returns season, the two busiest periods of a shipping center's year. Compl. ¶¶ 8, 37–38.

6. *The sham renewal.* On December 8, 2025, TUPSS's president told the Maxwells that the path forward was "swift execution of the MTA," a mutual termination agreement, and gave no reason why renewal was unavailable. Ex. D (December Renewal Correspondence); Compl. ¶ 34. One month later, TUPSS deceptively ran a renewal process as though renewal remained available. Its forms designated the transaction a "Renewal" and set January 17, 2026 as the date TUPSS would debit a $7,487.50 renewal fee from the Chicago Center's account. Ex. E (Intent to Renew Form), at 1, 5–6; Compl. ¶¶ 35–36. The Maxwells executed the renewal documents and paid. *Id.* TUPSS never told them that the renewal they were paying for would not

occur, and it has refused to refund the renewal fee or the approximately $1,700 in related survey fees it collected. Compl. ¶¶ 8, 36.

7. *The coerced termination agreement.* In May 2026, TUPSS told the Maxwells on a Thursday that unless they signed the MTA by Friday, it would cut off the systems the Chicago Center needs to process any transaction and put the store out of business by the weekend. Compl. ¶¶ 9, 39. With roughly twenty-four hours and no counsel, Carlos Maxwell signed. Antionette Maxwell never did. Ex. B, at 8; Compl. ¶¶ 40, 112. The MTA pays the Maxwells nothing. It falsely recites that they did not intend to renew; extracts a general release, a covenant not to sue, and a waiver of the right to rescind; and permits TUPSS to terminate immediately, for any default, without notice or an opportunity to cure. *Id.*, Recital B, §§ 4–8; Compl. ¶¶ 9, 41–44.

8. *The manufactured defaults.* Armed with that immediate-termination clause, TUPSS went looking for defaults. Center visits that had scored the Maxwells above 95% for a decade suddenly failed them on items never before evaluated, including grab-and-go merchandise that had sat on their shelves since opening day. In September 2026, while counsel were actively negotiating, TUPSS sent a field consultant to both Centers unannounced. Compl. ¶¶ 11, 57–59, 80–81.

9. *The mediation trap.* In October 2026, TUPSS's Chief Counsel, Bryan H. Clements, insisted on a November 3, 2026 mediation and warned that any failure to confirm that date would be treated as a refusal to mediate. He assured the Maxwells' counsel that TUPSS was "trusting that you and I are both aiming to bring this to a good resolution," split the mediator's fees, arranged pre-mediation sessions, and himself proposed a standstill running "through Nov. 5." On October 22, he wrote that he expected a response so that both sides could "be prepared for the mediation slated for Nov. 3." Compl. ¶ 12. In reliance on those assurances, the Maxwells stood down. *Id.*; *see also id.* ¶ 59.

### C. The October 30, 2026 Ambush

10. Eight days later, on Friday, October 30, 2026, TUPSS's outside counsel delivered letters terminating both Centers "effective immediately," and TUPSS locked the Maxwells out of its systems. Ex. L (7052 Final Termination); Ex. M (6591 Final Termination); Compl. ¶¶ 13, 55. In an act of breathtaking bad faith, the letters blamed the Maxwells for a supposed "failure to honor" their agreement to mediate, a mediation that TUPSS itself had demanded and that had not yet occurred. Exs. L, M; *see* Compl. ¶¶ 12, 59.

11. The letters' remaining grounds are pretext. They cite training that TUPSS had given the Maxwells until October 31 to complete, an "outstanding" invoice, and allegedly "delinquent" UPS invoices. Exs. L, M; Compl. ¶¶ 61, 69, 83. In fact, only a single invoice of approximately $3,678 was at issue, and the Maxwells did not know their card issuer had declined that charge. Compl. ¶ 84. The Maxwells paid that balance in full on October 31, 2026, almost immediately after learning of it. Compl. ¶ 85. Apart from that one charge, the Maxwells have never been delinquent with TUPSS. Compl. ¶¶ 26, 86.

### D. Plaintiffs Satisfy Each Requirement for Emergency Relief

12. To obtain a temporary restraining order or preliminary injunction, the movant must show that it will suffer irreparable harm absent relief, that traditional legal remedies are inadequate, and that it is likely to succeed on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). The Court then balances the harms to each side and the public interest on a sliding scale. *Girl Scouts*, 549 F.3d at 1086. Each element is satisfied here. *See* Mem. Parts I–III; Compl. ¶ 156.

13. *Likelihood of success.* The Maxwells have made a strong showing on independent claims, each established largely by TUPSS's own documents, Mem. Part III.A; Compl. ¶¶ 98–118:

(a) The MTA is voidable for economic duress. TUPSS obtained it by threatening to shut down the Chicago Center within a day, a threat that was wrongful because Illinois law forbids terminating a franchise without good cause, notice, and a reasonable opportunity to cure. 815 ILCS 705/19(a)–(b); *Arians v. Larkin Bank*, 253 Ill. App. 3d 1037, 1041 (2d Dist. 1993); *Carlile v. Snap-on Tools*, 271 Ill. App. 3d 833, 839–41 (4th Dist. 1995); Mem. Part III.A.1; Compl. ¶¶ 39–40, 98–107.

(b) TUPSS fraudulently concealed its decision not to renew while collecting the Maxwells' renewal fee, and no release can shield that fraud. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 761–62 (1st Dist. 2004); *Carlile*, 271 Ill. App. 3d at 839; Mem. Part III.A.2; Compl. ¶¶ 34–36, 108–111, 125–127.

(c) Antionette Maxwell never signed the MTA and is not bound by it, and any ambiguity must be resolved against forfeiture. *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 715 (7th Cir. 1985); Mem. Part III.A.3; Compl. ¶¶ 40, 112–113.

14. *Irreparable harm and no adequate remedy at law.* Absent relief, the Centers cannot process transactions, their signage comes down, their telephone numbers and listings pass to TUPSS, and a two-year non-compete bars the Maxwells from rebuilding. Ex. A §§ 14.1–14.2, Ex. D § 3(b)(iii); Compl. ¶¶ 13, 28–29, 52. Termination also destroys the only asset the MTA left the Maxwells: the chance to sell the business as a going concern. Mem. Part III.B; Compl. ¶ 16. Meanwhile, their rent, payroll, and other fixed obligations continue. Mem. Part III.B; Compl. ¶ 123. The loss of a going business and its goodwill is the textbook irreparable harm, and a damages award after trial would come too late to save it. *Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d

164, 167 (7th Cir. 1981); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see* Compl. ¶¶ 119–124.

15. *Balance of harms.* The balance overwhelmingly favors the Maxwells. Under the requested order, the Maxwells will continue operating the Centers under TUPSS's standards and paying TUPSS every royalty and fee. Compl. ¶ 14. TUPSS loses nothing but time. *Id*. Any burden it claims is of its own making, and denying relief would reward the party that destroyed the status quo before a court could rule. *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1248 n.7 (D. Colo. 2007); *Romper Room Inc. v. Winmark Corp.*, No. 14-C-1217, 2014 U.S. Dist. LEXIS 145432, at *15 (E.D. Wis. Oct. 10, 2014); Mem. Part III.C.

16. *Public interest.* Illinois has made a clear legislative judgment that a franchisor may not terminate an Illinois franchise without good cause, notice, and an opportunity to cure; may not refuse renewal without compensation where the franchisee cannot continue the business; and may not contract around either protection. 815 ILCS 705/19, 20, 41, 43; Mem. Part III.D. Relief also protects the Centers' employees and the Bridgeport and Burbank customers who rely on them, none of whom any damages award would reach. Compl. ¶¶ 123–124.

17. *Preservation of the status quo ante.* The Maxwells ask only that the Court preserve the last uncontested status between the parties: both Centers open, branded, connected to TUPSS's systems, and current on royalties, as they were until TUPSS's October 30 ambush. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944–45 (7th Cir. 2006); Mem. Part II; Compl. ¶¶ 14, 26, 50. TUPSS cannot define the status quo by destroying it on the eve of the very mediation it demanded.

18. *The California action does not bar relief.* On October 30, 2026, the same day it terminated both Centers, TUPSS filed a complaint for declaratory relief against Vision Chasers

alone in the Superior Court of California, County of San Diego, seeking declarations that its terminations were valid and that the post-termination obligations are enforceable. Ex. N (California Complaint) ¶¶ 1–5, 75–79; Compl. ¶ 55. That filing does not prevent this Court from preserving the status quo. First, it is an anticipatory declaratory action filed within hours of the terminations, while the Maxwells stood down in reliance on TUPSS's promise to mediate. Compl. ¶¶ 12, 55, 59. Second, the California action is a state-court proceeding that seeks only declarations; it does not name Carlos or Antionette Maxwell, and it does not reach the Maxwells' claims under the Illinois Franchise Disclosure Act or 42 U.S.C. §§ 1981 and 1982. Ex. N at 1, ¶¶ 7, 60–74; Compl. ¶¶ 131–133, 140–142, 157–168. Third, the San Diego forum clauses on which TUPSS relies are void under Illinois law. 815 ILCS 705/4, 41; Compl. ¶¶ 19–22. The Maxwells do not ask this Court to enjoin or interfere with the California proceeding; the relief requested runs only against TUPSS's own conduct toward the Centers.

**E. Relief Requested**

19. The Maxwells do not ask the Court to rescind the MTA, to order TUPSS to renew either franchise, or to decide the merits. They ask that the Court enter a Temporary Restraining Order, in the form of the proposed order submitted herewith, enjoining TUPSS and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from:

(a) giving any effect to the October 30, 2026, termination letters, or treating the Franchise Agreements for Center Nos. 6591 and 7052 as terminated, expired, or of no further force and effect, whether under Sections 2a, 2b, 2c, or 4 of the MTA or otherwise;

(b) disabling, suspending, restricting, or interfering with either Center's access to TUPSS's point-of-sale, center-management, carrier, or other operating systems, or with either Center's ability to process shipments and transactions;

(c) de-identifying either Center, removing or requiring the removal of TUPSS signage, marks, or trade dress, or requiring Plaintiffs to comply with any post-termination obligation under Section 3 of the MTA or Sections 14.1 or 14.2 of the Franchise Agreements;

(d) redirecting, transferring, or taking control of either Center's telephone numbers, listings, domain names, social media accounts, or other customer contact points, or exercising any power of attorney under Section 14 of the Franchise Agreements;

(e) exercising any right under TUPSS's Addendum to Lease for either Center's premises;

(f) enforcing the covenants in Exhibit D to the Franchise Agreements against any Plaintiff; and

(g) enforcing the Non-Exclusive Finder's Agreement against any Plaintiff.

20. The Maxwells further request that the Court:

(a) order TUPSS, within twenty-four hours of entry of the order, to restore each Center's access to all systems disabled or restricted on or after October 30, 2026, to the extent of the access that existed immediately before that date;

(b) suspend and toll all deadlines under the MTA, including the Purchase Agreement Deadline and the Transfer Deadline, pending further order, and order that such suspension is by order of this Court, is not an agreement, amendment, or extension

by any party, and does not alter the effective date of any release or covenant in the MTA;

(c) condition the order on the Maxwells' continued operation of the Centers in accordance with TUPSS's operating standards and continued payment of all royalties and fees as they come due;

(d) set an expedited hearing on the Maxwells' motion for a preliminary injunction and permit limited expedited discovery concerning TUPSS's decision not to renew, its processing of the Chicago Center's renewal in January 2026, the negotiation and execution of the MTA, the scheduling of the November 3, 2026 mediation, and the October 30, 2026 terminations;

(e) following that hearing, enter a Preliminary Injunction continuing the foregoing relief for the duration of this litigation; and

(f) grant such other and further relief as the Court deems just and proper.

**F. Notice and Security**

21. *Notice under Rule 65(b)(1).* The Maxwells do not seek relief *ex parte*. On November 3, 2026 at 4:55 PM Central Standard Time before filing this Motion, Carlos Maxwell notified TUPSS's Chief Counsel, Bryan H. Clements, and TUPSS's outside counsel in the California action, Zagros S. Bassirian and William D. Doodokyan of Greenberg Traurig, LLP, by email of the Maxwells' intent to file this Motion and served them with copies of the Verified Complaint, this Motion, the Memorandum of Law, the exhibits, and the proposed order. *See* Certificate of Service. The Maxwells will promptly notify TUPSS of any hearing the Court sets.

22. *Security under Rule 65(c).* The Maxwells request that the Court waive the bond requirement. The requested order requires the Maxwells to continue operating under TUPSS's

standards and paying TUPSS every royalty and fee while it is in effect, so TUPSS faces no realistic risk of monetary loss from being wrongfully restrained.

WHEREFORE, Plaintiffs Carlos Maxwell and Antionette Maxwell respectfully request that the Court grant this Emergency Motion, enter the proposed Temporary Restraining Order, set an expedited hearing on their request for a Preliminary Injunction, and grant such further relief as the Court deems just and proper.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Carlos Maxwell*

Carlos Maxwell, Plaintiff, *pro se*
7436 S. Oglesby Ave.
Chicago, Illinois 60649
Tel: 224-417-9221
Email: cemaxwell@prodigy.net

*/s/ Antionette Maxwell*

Antionette Maxwell, Plaintiff, *pro se*
7436 S. Oglesby Ave.
Chicago, Illinois 60649
Tel: 224-417-9221
Email: antionettemaxwell@prodigy.net

**CERTIFICATE OF SERVICE**

I, Carlos Maxwell, certify that on November 3, 2026, I filed the foregoing electronically with the Clerk of Court through the Court's CM/ECF system. Because Defendant has not yet appeared through a registered E-Filer, I also served the foregoing, together with the Verified Complaint, the Memorandum of Law, the exhibits, and the proposed order, by email on: Bryan H. Clements, Chief Counsel, The UPS Store, (bryanclements@upsstore.com); and Zagros S. Bassirian (zag.bassirian@gtlaw.com) and William D. Doodokyan (william.doodokyan@gtlaw.com), Greenberg Traurig, LLP, 12830 El Camino Real, Suite 350, San Diego, CA 92130.

Carlos E. Maxwell

/s/ Carlos Maxwell
Carlos Maxwell, Plaintiff, *pro se*